## MEMORANDUM OF INDEBTEDNESS

\_\_\_January 29\_\_\_, 20 18 ("Effective Date)"

This Memorandum of Indebtedness ("Agreement") is made and entered into by and between 1 Global Capital LLC, a Florida limited liability company, with a mailing address of 1250 East Hallandale Beach Boulevard, Suite 409, Hallandale Beach, FL 33009 (the "Borrower"), and PROVIDENT TRUST GROUP LLC FBO: Mark R. Harrah Roth IRA with a mailing address of ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ (the "Lender," or together, the Parties).

### RECITALS:

Lender has offered to provide funds, as described below, to Borrower as described in this Agreement. Lender is willing to make such funds available to Borrower and Borrower is willing to accept such funds upon and subject to the provisions, terms and conditions hereinafter set forth herein.

Subject to and upon the terms and conditions of this Agreement, Lender has agreed to provide Borrower the funds herein described for the purposes set forth below.

### TERMS OF AGREEMENT

1. <u>Indebtedness</u>. Lender hereby agrees to provide the sum of $ 30319.47 to Borrower in accordance with this Agreement.

2. <u>Existence</u>. Borrower is a limited liability company duly organized, validly existing, and in good standing under the laws of Florida, and is duly qualified to transact business as a foreign corporation in each jurisdiction where the nature and extent of its business and property requires the same.

3. <u>Authorization</u>. Borrower possesses all requisite authority, power, licenses, permits, and franchises to conduct its business and to execute, deliver, and comply with the terms of this Agreement. The execution and delivery of this Agreement, the consummation of the transactions herein contemplated, compliance with the terms and provisions hereof, and the execution, issuance, and delivery of the Agreement have been duly authorized and approved by Borrower.

4. <u>Enforceability of Agreement</u>. This Agreement, when duly executed and delivered by Borrower, will constitute a legal, valid, and binding obligation of Borrower and wholly enforceable in accordance with its terms.

5. <u>Litigation</u>. Borrower may be involved in litigation arising from its efforts to collect consumer debts and accounts. Borrower will not report such litigation to Lender unless it is likely to have a material adverse effect on Borrower.

6. <u>Maturity Date</u>. The Indebtedness shall mature at the end of the ninth month from the Effective Date (the "Maturity Date") and shall automatically rollover into a new indebtedness unless Borrower receives written notice of termination by the Lender no less than thirty (30) days before the Maturity Date. If this Indebtedness is terminated pursuant to this section, the distribution of any outstanding amounts owed to Lender by Borrower upon the maturity of this Indebtedness shall be controlled by Sections 8 and 11, below.

7. <u>Covered Activities</u>. This Indebtedness is designed to enable Borrower to expand its current business activities ("Covered Activities") for a certain period beginning on the Effective Date and ending on the Maturity Date (the "Activity Period"). The Covered Activities shall be conducted by Borrower in Borrower's sole discretion. Covered Activities shall include, but shall not be limited to, providing innovative funding known as a Merchant Cash Advance Transaction

("MCAT") in order to provide alternative financing for a market that is inadequately serviced by traditional banking and banking institutions.

8. <u>Payments</u>. Lender's payments during the Activity Period shall be based on Borrower's Covered Activities for the Activity Period, as follows:

8.1 Borrower shall enter into MCATs in certain amounts and with certain merchants, which shall be done in Borrower's sole discretion.

8.2 Upon Borrower's use of the Indebtedness for each individual MCAT, Borrower shall assign Lender a percentage of such MCAT, entitling Lender to that percentage of the regularly collected amounts received by Borrower for each individual MCAT ("Lender's Allocation").

8.3 The percentage assigned to Lender by Borrower for each MCAT shall depend on the monetary amount of the Indebtedness allocated to each MCAT by Borrower. Lender understands that the percentages assigned to it for each individual MCAT may vary and that the amount of the Indebtedness used by Borrower, and resulting assigned percentages to Lender, shall be decisions made by Borrower in its sole discretion.

8.4 Lender agrees that a thirteen percent (13%) management fee will be computed on and withdrawn from all collected amounts of Lender's Allocation for each MCAT. The net amount shall hereinafter be referred to as "Lender's Payment."

8.5 Borrower shall allocate Lender's Payment to Lender pursuant to this Section; however, Lender understands and agrees that Lender's Payment will be retained by Borrower as working capital through the Maturity Date.

8.6 Lender has been advised that the MCAT advances are repaid through Automatic Clearing House (ACH) debits deducted daily from the merchant's receipts, and or via

a percentage of merchant's daily credit card receipts. Lender's Payment shall be reinvested in future MCATs.

    8.7    The totality of Lender's Allocations, Lender's Payments, and any portion of the Indebtedness that has not been allocated to an MCAT shall hereinafter be referred to as Lender's "Account."

9.    <u>Monthly Reports</u>.  On a monthly basis, Borrower shall provide Lender a reconciliation statement that reflects the following: (a) the total value of Lender's Account; (b) a listing of each MCAT included in Lender's Account; and (c) the amount due to Lender from each MCAT.

10.    <u>Fees</u>. Lender understands that Borrower may owe an origination fee to a third party by entering into a MCAT with a merchant. Lender acknowledges and agrees that Borrower will use the Indebtedness or Lender's Payment to pay Lender's pro rata share of such origination fee (based on Lender's Allocation), if any.

11.    <u>Grace Period</u>. If Lender elects to terminate this Indebtedness on the Maturity Date pursuant to Section 6, upon maturity of the Indebtedness, monies from the ACH daily collections shall be paid to Lender as each MCAT included in the Account unwinds through the daily course of business, until such time that Lender's Indebtedness is repaid in full (the "Grace Period"). Any amount included in Lender's Allocation for each MCAT during the Grace Period, which has yet to unwind, shall continue to accrue pursuant to Section 8 until such time as the MCAT unwinds.

12.    <u>Lender's Acknowledgments</u>. Lender hereby specifically acknowledges and agrees to the following:

    12.1    The proceeds of this Indebtedness may be aggregated with other funds of Borrower for the Covered Activities of Borrower and any collateral (as set forth in Section 13)

associated with this Indebtedness shall be a proportional aggregate of assets acquired by Borrower therefrom and/or unspent proceeds of the Indebtedness held in Borrower's account, as the case may be.

12.2   Lender has no right to accelerate this Indebtedness. Lender may not transfer, encumber, assign, hypothecate, or otherwise transfer this Indebtedness to any other party, individual, or entity without prior written approval of Borrower.

12.3   Lender is a sophisticated and qualified individual, or business entity, and has entered into this Agreement for a commercial purpose. Lender's decision to execute this Agreement is and was based upon Lender's own independent evaluation of information deemed relevant to Lender, including, but not limited to, the information made available by Borrower to Lender, and Lender's independent evaluation of all such information. Lender acknowledges that Borrower has responded satisfactorily to all of Lender's requests for information.

12.4   Lender has relied solely on its own investigation and due diligence and it has not relied upon any oral or written information provided by Borrower, Borrower's personnel or agents, and acknowledges that no employee or representative of Borrower has been authorized to make any written statements other than those specifically contained or incorporated in this Agreement, and that Lender has not relied upon any such statements.

12.5   Lender has had the opportunity to do any and all due diligence and has had sufficient access to information to make its own credit decision, and it has performed such due diligence to its satisfaction. Lender has had the opportunity to seek advice from its own independent professionals. Lender understands that Borrower has made no representations as to the applicability of any federal or state statutes or laws.

12.6   Lender acknowledges that Borrower, in utilizing the Indebtedness provided under this Agreement, and in the ordinary course of its business, may maintain multiple accounts simultaneously and, as such, waives any right to bring any claim or complaint regarding Borrower's prioritization of one account or business function as to the utilization of the proceeds of this Indebtedness. All such decisions shall be made by Borrower based on its experience and in its sole discretion.

13.   <u>Collateral</u>.   Lender specifically acknowledges that this Indebtedness is secured by accounts/assets contained within the Lender's Account during the Activity Period, acquired by Borrower pursuant to the Covered Activities relating to this specific Indebtedness, or lesser portions thereof in aggregated accounts as delineated above.

14.   <u>Governing Law, Jurisdiction and Venue</u>. This Indebtedness shall be governed by and construed in accordance with the laws of the State of Florida, without regard to any applicable principles of conflicts of law. Any suit, action or proceeding arising hereunder, or involving the interpretation, performance or breach hereof, shall be instituted in Broward County, Florida.

15.   <u>Severability</u>. Any provision of this Agreement that is not enforceable in any jurisdiction shall, as to that particular jurisdiction only, not be effective but only to the extent it is not unenforceable, without making the remaining provisions of this Agreement invalid. It will not affect the validity or enforceability of that provision in any other jurisdiction.

16.   <u>Litigation and Attorneys' Fees</u>.  In the event that either party finds it necessary to retain counsel in connection with the interpretation, defense, or enforcement of this Agreement, the prevailing party shall recover its reasonable attorneys' fees and expenses from the unsuccessful party.

17. <u>Counterparts</u>. This Agreement may be executed in any number of identical counterparts, each of which shall constitute an original and may be delivered by facsimile or e-mail, and together shall constitute one instrument.

18. <u>Articles, Sections, and Exhibits</u>. All references to "Article," "Articles," "Section," "Sections," "Subsection," or "Subsections" contained herein are, unless specifically indicated otherwise, references to articles, sections, and subsections of this Agreement. The words "herein" "hereof," "hereunder" and other similar compounds of the word "here" when used in this Agreement shall refer to the entire Agreement and not to any particular provision or section.

All references to "Exhibits" contained herein are references to exhibits attached hereto, all of which are made a part hereof for all purposes, the same as if set forth herein verbatim, it being understood that if any exhibit attached hereto, which is to be executed and delivered, contains blanks, the same shall be completed correctly and in accordance with the terms and provisions contained and as contemplated herein prior to or at the time of the execution and delivery thereof.

19. <u>Number and Gender of Words</u>. Whenever herein the singular number is used, the same shall include the plural where appropriate, and vice versa; and words of any gender shall include each other gender where appropriate.

20. <u>Notices</u>. Unless otherwise expressly provided herein, all notices and other communications provided for hereunder shall be in writing and mailed by USPS certified mail, faxed, or delivered, to the address, facsimile number to the address specified for notices on the signature page below or to such other address as shall be designated by such party in a notice to the other parties. All such other notices and other communications shall be deemed to have been given or made upon the earliest to occur of (a) actual receipt by the intended recipient or (b) if delivered by certified mail, return receipt requested with signature or the intended recipient,

postage prepaid; or (c) if delivered by a nationally known overnight delivery service, upon receipt and signature of the recipient. Electronic mail and internet websites may be used to distribute routine communications, financial reports, and other information, and to distribute Loan Documents for execution by the parties thereto.

21. **Entirety and Amendments.** This Agreement embodies the entire understanding between the parties relating to the subject matter hereof (except documents, agreements and instruments delivered or to be delivered in accordance with the express terms hereof), supersedes all prior agreements and understandings, if any, relating to the subject matter hereof, and may be amended only by an instrument in writing executed jointly by Borrower and Lender and supplemented only by documents delivered or to be delivered in accordance with the express terms hereof. This Agreement may not be contradicted by evidence of prior, contemporaneous, or subsequent oral agreements of the parties. There are no unwritten oral agreements between the parties.

22. **Parties Bound.** This Agreement shall be binding upon and inure to the benefit of Borrower, Lender and their respective successors and assigns. No term or provision of this Agreement shall inure to the benefit of any Person other than Borrower and Lender and their respective successors and assigns; consequently, no Person other than Borrower and Lender and their respective successors and assigns, shall be entitled to rely upon, or to raise as a defense, in any manner whatsoever, the failure of Borrower or Lender to perform, observe, or comply with any such term or provision.

23. **Waiver of Trial by Jury.** Lender and Borrower knowingly, voluntarily and intentionally waive the right each may have to trial by jury with respect to any litigation that arises out of or under this Agreement.

THE PARTIES INDICATE THAT THEY HAVE READ THIS MEMORANDUM OF INDEBTEDNESS IN ITS ENTIRETY, UNDERSTAND ITS TERMS, AND AGREE TO BE BOUND BY THEM. THE UNDERSIGNED FURTHER WARRANT THAT THEY ARE AUTHORIZED TO EXECUTE THIS MEMORANDUM OF INDEBTEDNESS.

Signed this 29th day of January, 2018.

BORROWER:

1 GLOBAL CAPITAL LLC

By: *Darice Lang* [signature]

Its: Operations Director

LENDER:

PROVIDENT TRUST GROUP LLC FBO:

Mark R. Harrah Roth IRA

Accepted and Agreed to by Account Holder:

By: [signature]

Name: Mark R. Harrah

Title: _____